MATILDE CARDONA, Appellant, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., ET AL., Appellees.

No. 195. Argued April 8, 1940.—Decided May 24, 1940.

814

*Negrón López & Negrón López* for appellant. *M. León Parra* for the Commission. *George A. Malcolm, Attorney General, E. de Aldrey, Assistant Attorney General,* and *Víctor J. Vidal González* and *Guillermo Atiles Moreu,* (the latter two counsel for the State Insurance Fund), for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Matilde Cardona filed this petition for review in which it is substantially alleged that Luis Rodríguez Cardona, a workman, died as the result of an accident that occurred on April 30, 1939, and that the manager of the State Insurance Fund had ruled that the accident was not covered by the provisions of Act No. 45, Session Laws of 1935, relating to the matter;

That the appellant took an appeal to the Industrial Commission which, after a hearing in which both sides submitted oral evidence, affirmed the ruling of the manager. She moved for reconsideration, but the motion was denied on February 21, 1940;

That she feels aggrieved because as a matter of fact Rodríguez, the workman, was working as a helper in a truck belonging to Cities Delivery Express, his employer, driven by chauffeur Tomás Mas; that the truck was waiting for its turn to be loaded in Central Mercedita and when the same came the chauffeur called out to his helper, calling him "partner," and as he failed to show up, the chauffeur cranked up the motor and started the truck in reverse and caught and killed Rodríguez;

That the defenses set up by the manager were that the workman placed himself in a dangerous position by lying down underneath the truck and that the workman was guilty of wilful negligence in disobeying the instructions of his employer not to lie down underneath the trucks;

That the fact of the accident was established by the evidence heard, admitted by both sides, and that no witness testified to the effect that the workman was lying down underneath the truck, or that he was seen before the accident, or that they knew what he was doing behind the truck, it having been shown that the employer had never issued any warnings to his workmen.

The appellant finally specifically assigned the following errors as having been committed by the Commission:

"1. Failure to hold, after the accident had been shown, that it was incumbent upon the manager of the State Insurance Fund to prove affirmatively the facts constituting his defense.

"2. Erroneous application of the theory of circumstantial evidence to the present case.

"3. Finding, as proven, facts which the manager of the State Insurance Fund did not attempt to show and on which no evidence

was produced, viz.; (a) that the workman fell asleep underneath the truck, and (b) that the workman deliberately left off his work so as to go to sleep.

"4. Failure to hold that for wilful negligence to appear it was necessary that the workman be warned of the danger he was facing.

"5. Finding that this case is not compensable in contemplation of Act No. 45, Session Laws of 1935."

The hearing of the appeal was set for April 8, 1940. The appellant filed his brief on March 25 and that of the appellees was filed on April 8. The latter's counsel argued their case orally on April 8 and the appellant filed a brief in reply on the 22nd.

■■ The findings of the Commission relied upon for its affirmance of the manager's ruling were as follows:

"It appears from the evidence that Luis Rodríguez Cardona was working as a helper in the truck driven by Tomás Mas Rivera about April, 1939.... It clearly appears from the same that....Mas,.... instructed his helper....not to go far from the truck as they were shortly going to load, and that the helper....whose duty it was to crank up the truck while the chauffeur would ignite the motor in order to start.

"....that Luis Rodríguez Cardona was not ready for work just when needed, because on being called by the chauffeur of the truck to crank up the motor in order to start the truck and to begin loading,....he failed to answer. Tomás Mas Rivera called out to him repeatedly and loudly....but no answer came.... He thought ....that his helper might be somewhere else chewing canes ....he proceeded to crank up the motor himself, and as he could not at the same time attend to the throttle, he placed on it a piece of board to exert pressure on the accelerator so as to start the motor when cranking up, which he successfully did....It is upon....his starting the truck in reverse that moans from a person were heard and it was then that Luis Rodríguez Cardona comes out from underneath the truck and behind its rear wheels, moaning and twisting, because the rear wheels of the truck had passed over his chest. None of the witnesses testified to have seen Luis Rodríguez sleeping underneath the truck, and none of them was able to state where he was....prior to the accident. The witnesses became aware that he....was underneath the truck when he came out moaning and twisting.

" . . . .that Luis Rodríguez Cardona, after preparing the truck for their turn to load, went away and lay down underneath the truck where he fell asleep. The circumstances and the facts prove so, as the chauffeur of the truck repeatedly and loudly called out his helper. . . .who failed to answer. This shows that. . . .he fell asleep underneath the truck and was not able to hear Tomás Mas Rivera calling him. The evidence fails to show that the employer had instructed its truck employees not to sleep underneath them, but it may reasonably be thought that underneath a truck is neither a safe nor a comfortable place for a human being to sleep, the less so if such truck is ready, or waiting for its turn, to load or unload.

" . . . .The. death of Luis Rodríguez Cardona was not the result of his having fallen from the truck, or of injuries received while cranking up the motor of the truck or while trying to climb up on the truck, or of injuries inflicted by the rear wheels of the truck while moving in reverse and he then being behind the truck signaling to or warning the chauffeur while the latter was putting in reverse. The accident did not take place while either of the above circumstances occurred. . . .it happened. . . .because he had fallen asleep underneath the truck. It was not his business to go to sleep or to rest underneath the truck. One of the witnesses testified that there was a more suitable place for a person to rest and to protect himself from the sun and the rain while the truck was at a standstill."

The evidence heard by the Commission was as follows: Efigenio Rivera testified that he was the driver of a truck belonging to Cities Delivery Express and that Tomás Mas was the driver of another; that Rodríguez Cardona was working as the helper of Tomás Mas; that on April 30 he drove to Central Mercedita and parked his car alongside Mas' car which was already there; that Mas' helper was lying down on the driver's seat of Mas' car and that Mas "told him to get the car ready as they were going to load soon; the boy got up to get the truck ready, the tailboard etc., stretched the tarpaulin and meanwhile Tomás stretched out on the driver's seat of the truck . . . . . they call Tomás to come and load and Tomás climbs down and starts calling his "partner," Rodríguez Cardona; "as no answer came, as usually they go to the mills to chew cane, . . . Tomás went to ignite the motor . . . . did not wait for him . . . . ,

cranked it up and while reaching the accelerator the motor stopped whereupon he picked up a piece of board and placed it in position . . . . . drove it back a little and he says that the felt when the car jumped, I never saw the man lying down, but then this other witness says that when he ran up, when he came out, he told him to stop, that he was run over and we went there and we found the man twisting.''

Cross-examined by the Commissioner he answered as follows:

''Q. Did you see Luis Rodríguez asleep underneath the truck?— A. No, Sir.—Q. You have stated that he was asleep, did you see him or were you told?—A. Because it was presumed, it was said that he was asleep on the driver's seat of the truck.''

José Pietri, who drove a truck of the firm Successors of Méndez, who was also there, testified that Tomás Mas, on being told that his turn had come, ''went towards the truck . . . . and·called out to a boy, the trucks were facing each other and he then went to crank it up and when he did so the motor stopped . . . . he then got a piece of board and pushed down the accelerator and cranked it up again, the motor went on running while he went round and climbed up, but there was another truck next to his which prevented him from moving. forward, he then drove backwards, and I saw that boy by the side of the truck doing this, wriggling . . . . . I imagined that he was pretending, we the drivers shouted so as to frighten the laborers and I myself thought that he was joking with the driver himself, whereupon I saw him fall backwards and then I ran up and said to Tomás: 'Look, you have run over this boy' and he then jumped down and on reaching the boy we found out that two of the wheels had passed over his chest.

The following questions were put to him by counsel for the workman:

''Q. If a chauffeur is late in taking his turn, what happens to him?—A. They order another to take his place. Q. Must it be done quickly?—A. Yes, Sir. Q. And Tomás, had he any interest

in getting there soon?—A. If he was going to avail himself of his turn he had to do so quickly, if he is five minutes late another truck is ordered to move, because the machine for dumping sugar can not wait. Q. Do you know whether he was asleep?—A. I do not. I saw him when he was wriggling. Q. Can you tell whether he was going to climb up and fell?—A. No, Sir. Not at all. Q. Can you not tell whether he was passing, and slipped and fell?—A. Not at all.''

Lastly, driver Tomás Mas testified that ''at 1.30 p.m. on that day,'' a Sunday, they had already made two trips, and his helper, who had gone to lunch, returned and stretched out on the driver's seat for a nap, ''the boy already had been there ten minutes and I told him not to go far as we were going to load; when our turn to go in came I called him but failed to find him, I used to call him ''partner'' as I did not know his name, I called him repeatedly but he failed to come; they used to go to the mills to chew canes and we would then park the trucks for loading.'' To the question from the Commissioner ''Did you happen to search for him underneath the truck?,'' he answered, ''I called him.'' He proceeded in his testimony: ''He did not answer and I unsuccessfully looked for him about the mills . . . . . I then cranked up the motor but it stalled, I then placed on the accelerator a piece of board like this . . . . . in cranking up, the motor was raced, Román's truck was next to me and I put in reverse and in doing so I heard a shriek, I climbed down, looked behind the truck and saw the boy wriggling, it looked to me as if there was something the matter with him and I then asked him and he told me that the wheels had run over his stomach, and we then sent him to town in a jitney.''

To questions from the Commissioner, he answered as follows:

''Q. Can you tell what he was doing behind the truck's wheels?—A. I can not. Q. Did you see him asleep?—A. I did not. Q. Did he not tell you what he was doing underneath the truck?—A. He did not. Q. Did he come out from underneath the truck?—A. He did, when I saw him he had already come out....... Q. May drivers or

their helpers of such trucks go to sleep underneath them?—A. I do not think so. Q. Is that so because it is forbidden by the corporation?— A. No, Sir. Q. Have you been warned not to go asleep underneath the trucks?—A. We have never been so warned. Q. And subsequent. to this unfortunate accident?—A. Afterwards we have."

To questions from counsel for the State Fund, he answered:

"Q. When you made the workman, your helper, get up from the seat, and told him to prepare to get the truck ready, did you see the way he went?—A. I did not, he disappeared, he was leaning on the seat and I called him, he had arrived long before and had got the truck ready. Q. When you were going to move the truck, did you call him?—A. I did.... Q. Did he not show up?— A. He did not."

Examined by counsel for the workman, he answered:

"Q. Why did you not wait for Luis to arrive and crank up the motor?—A. We can not wait, because as soon as there is a call for a truck from the storehouse, the truck must get there immediately."

Under the express terms of the law—Act No. 45 of 1935— which authorizes the review of the final orders or decisions. of the Industrial Commission, such review "can only be made with regard to questions of law." *Amenguar* v. *Industrial Commission*, 49 P.R.R. 10; *Aguila* v. *Juliá*, 50 P.R.R. 599.

As we have been able to find in stating the case, in order to decide the same we will have to review the weighing of the evidence on the part of the Commission in order to determine whether or not it is a labor accident, and whether or not the workman was lying asleep underneath his employer's truck. As the questions involved are, therefore, of fact, we can only disturb the decision of the Commission if we find that there was no evidence to sustain it, or if a substantial error had been committed in making the finding. *Montaner* v. *Industrial Commission*, 54 P.R.R. 757; *Umpierre* v. *Industrial Commission*, 52 P.R.R. 739.

██ Did petitioner prove a *prima facie* workmen's accident? Let us see.

As stated in *Montaner* v. *Industrial Commission,* 53 P.R.R. 187, 189 "According to the clear language of the statute, three requisites must concur for an injury to be compensable. The injury must (*a*) be the result of an act or function inherent in the employment, (*b*) have occurred in the course of the employment, and (*c*) be the consequence of the employment. If one of these requirements is lacking the accident is not compensable."

The accident which resulted in the death of the workman at the time and place stated by the appellant is admitted. It is also admitted that the workman was helping the employer's truck driver, and that his death occurred during working hours while the driver was calling the workman in order to move the truck and the truck was moving to load clearly appears from the evidence.

In our opinion the above is sufficient to bring the case, *prima facie,* within the purview of the Workmen's Accident Compensation Act of 1935.

In his work "Workmen's Compensation Law," vol. II, p. 1855, topic 527, Schneider says:

"A person found dead at a place where he was supposed to be acting in the course of his employment, shall be presumed to have died in the course of his employment."

He cites in support of the text: *Donlon* v. *Kips Bay Brewing & Malting Co.,* App. Div., 179 N.Y.S. 93, 5 W.C.L.J. 429, (1919); *Flucker* v. *Carnegie Steel Co., Pa.* (1919), 106 Atl. 192, 3 W.C.L.J. 780, 18 N.C.C.A. 1056; *Saunders* v. *New England Collapsible Tube Co., Conn.* (1920), 110 Atl. 538, 6 W.C.L.J. 271; *Sparks Milling Co.* v. *Indus. Comm.,* Ill. (1920), 127 N.E. 737, 6 W.C.L.J. 299.

It was urged by the manager of the State Fund that the accident was not compensable because the workman assumed a dangerous position in lying down underneath the truck and that the workman disobeyed warnings to the contrary in that respect issued by his employer. As regards

such warnings, such defense was stricken out by the Commission itself. No evidence was introduced in support thereof. Concerning the dangerous position, the Commission not only found that the workman lay down underneath the truck but also that he fell asleep there. Did the evidence heard furnish the Commission any legal basis for such finding? The decision of the present appeal hinges upon the answer to this question.

Act No. 45 of 1935 provides as follows:

"Section 4.—Accidents occurring under the following circumstances are not compensable labor accidents, and, therefore, shall not entitle a workman or employee, or his heirs, to compensation under this Act:

" .        .        .        .        .        .        .

4. When the recklessness of the workman or employee is the sole cause of the injury."

In *Umpierre* v. *Commission, supra,* this court, through Mr. Justice Travieso, expressed itself as follows:

"In order for the act of an employee to be characterized as wilful misconduct so as to deny him compensation, it is necessary to show that the employee acted in disobedience of express orders of the employer and after having been warned of the danger which he was risking in doing the prohibited act. All of the cases which petitioner cites so hold. For example, we shall cite the following cases:

" 'Injuries resulting from those acts which are in direct hostility to, and in defiance of, *positive orders of the employer* concerning instrumentalities, places, or things about or on which the employee has no duty to perform, and with which his employment does not connect him, are not compensable.' (Italics ours.) *Dickey* v. *Pittsburgh & L. E. R. Co.,* 297 Pa. 172, 146 Atl. 543.

" 'If an employee goes to a department other than his own, and is injured while seeking to hurry work which he is authorized to do in his own department, the injury is not received in the course of his employment, *where there is a rule known to the employee, restricting the activities of employees to their own department.'* (Italics ours.) *Hyatt* v. *United States Rubber Reclaiming Co.,* 230 App. Div. (N. Y.) 743, 243 N. Y. Supp. 474.

" 'An employee who sustains an injury in a department of his employer's plant into which, on account of the risk of injury, *he has been positively told by his superiors not to go,* is not injured in the course of his employment; especially where he went into this department and performed work there to serve his own personal convenience, and for his own financial gain.' (Italics ours.) *Kasper* v. *Liberty Foundry Co.,* (1932) Mo. App., 54 S. W. (2d) 1002.

"The numerous cases which petitioner cites support the doctrine that an employee is guilty of wilful misconduct and loses his right to compensation, where, after having been warned by the employer of the risk which he is running, he does the prohibited act and assumes the risk of being injured. Wilful misconduct is something more than negligence; there is implicit in it the idea of conduct almost criminal, or, in other words, a deliberate intention to do a prohibited act with full knowledge of its probable consequences. See: *Clark* v. *Los Angeles County,* 1 Cal. I.A.C.; *Haffenayer* v. *United Keanograph Film Mfg. Co.,* 1 Cal A. C. Dec. 620. Petitioner, in arguing that this doctrine is applicable to the instant case, says in his brief:

" 'The authorities have reached a definite conclusion in cases of this kind, that *an employee who violates positive orders of his employer,* given for his protection, steps out of "the course of his employment," and if injured, the injury has not been received "in the course of his employment" or "by reason of his employment" which are essential requisites for fixing liability.' (Italics ours.)

"The authorities also hold that the burden of proof, when wilful misconduct is set up, rests upon the defendant; that the defense has not been duly established where there is doubt as to whether the risk of danger was undertaken deliberately and wilfully; and that when the injury causes death, the evidence must be clear and unequivocal and of such a degree as to establish the defense beyond all reasonable doubt, for the reason that the lips of the employee, sealed by death, cannot be opened in his own defense. See: *Hedges* v. *City of Los Angeles,* 1 Cal. I.A.C. Dec. 394; Honnold Vol. I, p. 568; *Freid* v. *Smith Lumber Co.,* 2 Cal. I.A.C. Dec. 117.

"We are of the opinion that the employer in this case has not established satisfactorily his defense of wilful misconduct. We already said that the evidence offered to show that Villanueva had received express orders from the employer is insufficient. Clear and unequivocal evidence was not presented that the employee was expressly warned of the danger, and, in view of the fact that the employee was on the truck with the consent of the employer, in the

performance of the duties of his employment to take stone from the quarry for delivery at the construction (works), we are not warranted in presuming that the act of trying to get from where he was seated on the rock to the place by the side of the driver was done by Villanueva with the deliberate intent of disobeying the orders of his employer and of assuming the risk of being injured. It would be more logical to presume that Villanueva was merely trying to find a less dangerous and more comfortable seat than the one upon the rock assigned to him by his employer. There was no error in applying the law to the facts which the commission found proved. The commission did not err in holding that the accident occurred in the course of the workman's employment and that the injury is compensable under the provisions of the present statute.''

The appellee Commission itself admits that ''neither of the witnesses testified to have seen Luis Rodríguez Cardona asleep underneath the truck.'' Notwithstanding this, it concludes that he was asleep underneath the truck because ''none of the witnesses was able to state where he was'' either, and because, being repeatedly called out loudly, he failed to answer. That is, the Commission admits that there was no direct evidence although it maintains that there was indirect evidence as to the essential fact which it found to have been proven.

It has been repeatedly held that indirect or circumstantial evidence is sufficient evidence and at time is the best, but it has been added that the same is required to be incompatible with any reasonable hypothesis that might be made concerning the innocence of the accused. And here indeed the circumstantial evidence is compatible with some reasonable hypothesis other than that considered as the only one by the Commission. The workman might have failed to answer for some other reason, it being somewhat peculiar that if he was lying down asleep underneath the truck he was not awakened by the noise of the motor nor was he seen by the driver when the latter climbed down to crank up the motor. The workman might have momentarily left the truck, he might have answered and not been heard by the driver owing to the noise of the

motor and might have been caught by the truck just as he got to it when the same was started in a hurry so as not to miss its turn to load sugar.

■ That being so, we think that the conclusion reached by the Commission regarding the only fact that might preclude this case from the application of the provisions of the Workmen's Accident Compensation Act is not legally warranted. If any doubt existed, it should be settled in favor of its inclusion, in view of the liberal spirit in which the law has been conceived and which tends towards the protection of the workman or of those whose support depended on his work.

The decision appealed from must be reversed and the case remanded to the Commission with instructions to fix the proper compensation in accordance with law.

Mr. Justice Wolf, dissented.